**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LINDA VAN DIKE, | § | |
|     PLAINTIFF, | § | |
| | § | CASE NO.: 4:23-CV-04517 |
| VS. | § | |
| | § | |
| GVA, LLC, AND | § | |
| ALAN STALCUP | § | |
|     DEFENDANTS. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Linda Van Dike now files this First Amended Complaint against Defendants New Aspen Management, LLC d/b/a GVA Property Management,[1] and Alan Stalcup.  In support, Van Dike states as follows:

### PARTIES

1.     Linda Van Dike is a resident of Harris County, Texas.

2.     Defendant New Aspen Management, LLC d/b/a GVA Property Management ("GVA") is a Texas corporation with its principal place of business in Austin, Texas.  It may be served with the Summons and this Complaint via its registered agent for service of process, Registered Agent Solutions, Inc. located at Corporate Center One, 5301 Southwest Parkway, Suite 400, Austin, Texas 78735.  It may also be served as otherwise set forth in Rule 4 of the Federal Rules of Civil Procedure.

3.     Defendant Alan Stalcup is identified on GVA's website as the founder and Chief

---

[1]Plaintiff's original Complaint (Dkt. 1) named GVA, LLC, as a defendant.  This appears to be a different entity than New Aspen Management, LLC d/b/a GVA Property Management, as advised by counsel for New Aspen. Consequently, Plaintiff hereby amends her pleading as a matter of right under FED. R. CIV. P. 15(a)(1) to correct this misnomer.  By this amendment, GVA, LLC is dropped from the case and New Aspen Management, LLC is added. This pleading further relates back to the original filing date pursuant to FED. R. CIV. P. 15(c)(1)(C).

Executive Officer of "GVA Real Estate Group". He is listed on the Texas Secretary of State website as the sole managing member of New Aspen Management, LLC d/b/a GVA Property Management. He is a resident of Travis County, Texas. On information and belief, Stalcup can be personally served at his residence, 3613 Murillo Circle, Austin, Texas 78703, or wherever else he may be found. He may also be served as permitted under the Federal Rules of Civil Procedure.

## VENUE

4.      Venue is appropriate in this Court because all or a substantial part of the claims described herein arose within this judicial district. In fact, this case arises out of Plaintiff's long-time employment with, and termination from, the Defendants within this judicial district.

## JURISDICTION

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States.

## FACTS

6.       GVA manages multi-family housing units.

7.      GVA is based out of Austin, Texas, but owns and manages properties in Florida, Georgia, Tennessee, North Carolina, South Carolina, and Texas. GVA states it has between 201 and 500 employees.[2]

8.      On information and belief, Defendant Stalcup is identified as the founder and CEO of GVA Real Estate Group.[3] He is listed on the Texas Secretary of State website as the sole

---

[2]https://www.linkedin.com/company/gva-property-management/about/ (last visited October 31, 2023)

[3] https://gvamgt.com/investment-team/ (last visited November 28, 2023)

managing member of GVA.  Stalcup acts both directly and indirectly in the interest of Defendant GVA.  He is the highest-ranking person in the company.  As such, he also ultimately oversees all employment decisions, which includes hiring and firing.  He is an "employer" as that term is defined by the Fair Labor Standards Act and the Family & Medical Leave Act.

9.      Plaintiff began working for GVA in February of 2020 as a property manager of a Pasadena, Texas apartment complex.

10.     A little over one year after she was initially hired by GVA, Plaintiff was promoted to "floating manager" over five Houston-area properties.

11.     While serving as a floating manager, Plaintiff became aware that GVA was going to sell the properties she managed.  The company purchasing the properties began interviewing employees at the five properties Plaintiff managed, but did not interview Plaintiff.

12.     Once the sale finalized, GVA offered Plaintiff a new position with the company, Operations Support Specialist ("OSS").  The other GVA employees who worked in operations worked in-person at the Austin, Texas headquarters.  Because Plaintiff lived in Houston, she was offered a remote position with the Austin office.  So while Defendants employed her to work physically in Houston, she was technically part of the Austin office.

13.     Plaintiff started as an OSS at the end of 2021.  As an OSS, Plaintiff was responsible for two main tasks: commission reviews and Stern Risk audit insurance reviews ("Stern Risk reviews") for approximately 148 properties.

14.     Conducting commission reviews involved Plaintiff reviewing leases and ensuring the proper commission was paid to the proper GVA leasing agent(s) or employee(s) who were responsible for securing the move-in or renewal.  This job involved going through a checklist to

ensure items in the most recently-signed leases had been done.  For example, she would check to verify that deposits were timely paid (in the proper amounts) and that all places on the lease that required a signature had been signed.  These tasks were both menial and extremely time consuming.

15.     During the second week of each month, when Plaintiff had to finalize commission reviews, she would typically work anywhere from 80-90 hours.  Defendants did not pay Plaintiff any overtime compensation for these hours worked in excess of 40 per week.

16.     Stern Risk reviews were similar in that she was simply reviewing resident files to ensure that residents had proper insurance (either through a third-party or Stern Risk Insurance) and, if enrolled in Stern Risk Insurance, that the resident was being charged the proper fee.  During the third week of each month, when she conducted and finalized Stern Risk reviews, Plaintiff would typically work 70-76 hours.  Defendants didn't pay any overtime compensation for these weeks, either.

17.     Defendants knew that Plaintiff was burning the midnight oil to get her work done. She would often send emails in the very early hours of the morning, sometimes as late as 2:00 a.m., and also throughout the weekends when she was not ordinarily scheduled to work. Commissions had to be processed in time for payroll.  Without her doing these tasks timely, people wouldn't get paid. So this often kept her up late at night to complete her work in a timely manner.

18.     Plaintiff was never compensated for the overtime hours she worked, which her management was aware of.  In fact, when her supervisor noticed she was consistently sending emails into the wee hours of the morning, Plaintiff was told to stop sending emails so late and to instead schedule them to be sent at 8:00 a.m. the next morning.  On information and belief, the

company apparently did not want there to be a documentary record of the overtime she was working.

19.    Plaintiff complied and would schedule late-night emails to send at 8:00 a.m., often scheduling upwards of fifteen (15) emails to send just as the workday began.

20.    In addition to commission reviews and Stern Risk audits, Plaintiff also occasionally helped deal with resident complaints or when on-site property managers had questions about commissions, renewals, and insurance. To say that Plaintiff's plate was full would be an understatement.

21.    Plaintiff successfully juggled all these tasks and worked without any write-ups or reprimands.

22.    In or around February 2023, Plaintiff approached Human Resources partner Zelena Waltner to inquire about taking FMLA leave. Plaintiff knew she would soon be finalizing the adoption of two children and that, as a result, she would likely qualify for leave.

23.    Before GVA divested itself of the properties in Houston, Plaintiff physically worked at a leasing office at one of the Houston area apartment complexes. Afterwards, though, she no longer had a fixed worksite and worked directly for the corporate office in Austin. Thus, this was the site to which Plaintiff was assigned as her home base, from which her work was assigned, and to which she reported. *See* 29 C.F.R. § 825.111(a)(2).

24.    In or around February 2023, GVA had 50 or more employees working within a 75-mile radius of its Austin office.

25.    When Plaintiff had worked at the GVA property in Houston, she had adopted another child. She had asked for FMLA leave in connection with that child's adoption, but her

5

request was denied on grounds that there weren't enough employees within a 75-mile radius of her Houston office. But in February 2023, now working for and reporting to Austin, Plaintiff knew that she would be eligible for leave. This is because, as noted above, GVA had 50 or more employees within a 75-mile radius of the Austin office.

26.     Waltner told Plaintiff to apply for leave, so Plaintiff did. In response to her request, GVA began demanding documentation, including a signed court order granting the adoption. This document did not yet exist, and would not exist until the adoption was approved. Nonetheless, Plaintiff was told that this request was "per company policy", even though she had already submitted a copy of the adoption petition. Plaintiff asked if there was a written policy requiring submission of a signed court order before she could request FMLA leave. GVA responded that there was no written policy to that effect and assured her that she had already submitted everything she needed to get approved for leave.

27.     Plaintiff never received any formal or final confirmation that her leave had been approved. She continued to follow-up with GVA human resources, but she was ignored for weeks.

28.     The week of the adoption arrived, and Plaintiff still hadn't received approval. And nor could or would GVA explain why she had not been approved. Plaintiff emailed human resources asking for an explanation.

29.     Hilda Green, Vice President of Human Resources, responded to Plaintiff via email, apologizing profusely for the delay in approving her leave request. In that same email, she asked to speak with Plaintiff before her leave was set to begin, supposedly to discuss some "movement" in her department. Plaintiff, Green, and Waltner set up a time to talk. Plaintiff assumed this was just a routine, housekeeping conversation.

6

30.   The next day, in advance of the scheduled call with Green and Waltner, Plaintiff received a call from another OSS working in the Austin office.  This co-worker told her it was "not fair" what GVA was doing to Plaintiff.  Plaintiff was confused, having no idea what her colleague was talking about.

31.   The call with Green and Waltner occurred on March 30, 2023.  Green started by telling Plaintiff that GVA wanted her to have "plenty of time to spend with her family".  Plaintiff had no idea what she was talking about.  Green then told her that her FMLA leave request was being approved but, to Plaintiff's complete shock, she was being terminated that day because of an alleged reduction in force.  Green said Plaintiff's position was no longer needed in the company.  Green offered Plaintiff two-weeks of paid maternity leave, three (3) weeks of severance pay, and to pay out her remaining paid-time off and holiday pay, but only if she signed a release of claims.  This release would have required Plaintiff to sign away any rights that she might have to sue the company for FMLA retaliation or interference.

32.   A few minutes after the phone call ended, Plaintiff received a call from her supervisor, Jessica Cardenas.  Cardenas was calling to follow up about an ongoing project.  Plaintiff told Cardenas that she had just been terminated.  Cardenas was blindsided.  She said she had no idea this was happening.  Cardenas became upset on the call, telling Plaintiff that she was essential to Cardenas' team and that she needed Plaintiff's help.

33.   In other words, Green's statement that Plaintiff was being terminated because of a reduction in force and that her position was no longer needed was a complete fabrication.

34.   In fact, there was no reduction in force underway on March 30, 2023.  And it was flatly untrue when Green told Plaintiff that was the reason for her termination.

### FIRST CAUSE OF ACTION: VIOLATION OF 29 U.S.C. § 207

35.    Plaintiff was formerly employed by Defendants.

36.    At all times relevant to this Complaint, Defendants, GVA and Stalcup were the "employers" of Plaintiff.  GVA has at all relevant times had annual sales totaling $500,000 per year or more.

37.    Defendants violated the FLSA by failing to pay Plaintiff overtime wages based on the formula set forth in the statute.

38.    For all time worked in excess of forty hours in each individual workweek, Plaintiff was entitled to be paid one and one-half times her regular rates.  29 U.S.C. § 207.

39.    The Defendants have therefore violated the FLSA by failing to pay Plaintiff and in a manner consistent with the FLSA's requirements.

40.    No exemption provided in the FLSA or recognized by the Courts authorized the Defendants to fail to pay overtime to Plaintiff.

41.    Defendants' failure to pay overtime to Plaintiff was willful within the meaning of 29 U.S.C. § 255(a).

42.    Plaintiff is entitled to recover all unpaid wages that she is owed pursuant to the FLSA.

43.    In addition to recovering her unpaid wages, the Plaintiff is entitled to recover an additional amount equal as liquidated damages pursuant to 29 U.S.C. § 216(b).

44.    Defendants' violations of the FLSA were willful.

### SECOND CAUSE OF ACTION: FMLA INTERFERENCE AND RETALIATION

45.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

46.     Plaintiff engaged in a protected activity under the FMLA by requesting leave in connection with the adoption of her children.

47.     Defendants have taken one or more materially adverse actions against Plaintiff because she engaged in conduct protected by the FMLA.

48.     Defendants have taken one or more materially adverse actions against Plaintiff for the purpose of interfering with her exercise of, or the attempt to exercise, her rights provided by the FMLA.

49.     Not only did the Defendants terminate Plaintiff to punish her for requesting FMLA leave (or to interfere with her right to take FMLA leave), but to add insult to injury it failed to pay her out for nearly 43 hours of unused paid time off.  This was in contrast to the company's policy, which was to monetize such unusual PTO and disburse it to workers following their separation from the company.

50.     Plaintiff has been damaged as a result of Defendants' interference and retaliation.

### ATTORNEY'S FEES

51.     Plaintiff seeks an award of attorney's fees and costs, including expert fees, pursuant to the FLSA and FMLA.

### JURY DEMAND

52.     Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

53.     Plaintiff respectfully prays that Defendants be cited to appear and answer, and that on final hearing of this cause, the Court award Plaintiff the following relief:

      a.     back pay;

b.  reinstatement and/or front pay;

c.  compensatory damages;

d.  punitive damages;

e.  attorneys' fees and costs;

f.  pre- and post-judgment interest; and

g.  such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

DOW GOLUB REMELS & GILBREATH, PLLC

/s/ Andrew S. Golub
Andrew S. Golub
Attorney-in-Charge
S.D. Tex. No. 13812
Texas Bar No. 08114950
asgolub@dowgolub.com
Lauren L. Van Ness
S.D. Tex. No. 3633957
Texas Bar No. 24105723
lvanness@dowgolub.com
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Telephone: (713) 526-3700
Facsimile:  (713) 526-3750

ATTORNEYS FOR PLAINTIFF